# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 2

## A.    Detailed Discussion of Options for Legislation

We are considering the following framework for legislation and options to settle the three types of Tribal claims:

### 1.    Payment of Type 1 Claims

- **Payment of All Claims.**  Type 1 claims are those where the Arthur Andersen Project report indicates that there has been an error.  Because the Department has an obligation to correct its known errors, Tribes would be paid in full without regard to the Tribe's willingness to settle any other claims.  The Department recommends that the government pay the Tribe any principal amounts owed, plus interest as defined below.

Three types of claims fall within this category.  First, of the amounts reconciled in the Basic Reconciliation portion of the Project, approximately $1.87 million in transactions (excluding interest) were found to be in error -- an error rate of about .01 percent.  An additional $25.2 million (absolute value) in proposed adjustments were identified in the entire Project.[10]  These known errors include both underpayments and overpayments to Tribal trust fund account holders.

Second, some Tribes claim that interest is owed due to the lag time between when funds were paid to the BIA and when they were deposited.  While we agree that interest should be paid, there is a question as to when interest should begin to accrue.  For example, interest could begin to accrue after 1-3 days, 4-6 days, 7-10 days, 11-30 days or over 30 days.  The Department believes it is entitled to a commercially reasonable time to deposit checks in Tribal accounts (due to mailing, processing, check clearance, etc.), but that time should be limited and Tribes should receive interest only after that period has passed.  We recommend that interest be paid to Tribes beginning after six (6) days, whether or not the funds have actually been deposited.[11]  In addition, there are interest claims relating to lag time from when money was received by the Minerals Management Service (MMS)

---

[10]  The $1.87 million does not include adjustments of less than $1,000 that were accepted without further research, which are referred to as "scoped adjustments."  These scoped adjustments would also be considered known errors and would be paid as Type 1 claims.

[11]  Because reservations tend to be located in isolated and remote areas, reliance on mailing is typical.  During the 1972-1992 reconciliation period, approximately one-third of the payments were made electronically.

14

and when it was actually credited to the accounts by BIA. The Department believes that interest should be paid on these claims from the date the funds were received by MMS. If Congress adopts this policy for the reconciliation period, the government would owe $1.7 million in back interest [12]

The third type of Type 1 claims involve so-called "rollover amounts." These amounts result from end-of-accounting period balances in Tribal trust accounts in BIA's general ledger that do not always equal the balance recorded in the general ledger for the beginning of the subsequent accounting period. The Advisory Board proposes to forgive $26.1 million in principal plus interest in cases where an account balance increased, and to pay Tribes $17.5 million in principal plus interest where a Tribe's account balance decreased. These amounts assume netting of rollover increases against rollover decreases at the account level; and no netting of rollover adjustments against known errors.

These rollover discrepancies result from accounting entries that change the beginning balance of a Tribe's account for an accounting period. Although a transaction history does not show up in the BIA general ledger, the entries should appear in the BIA's monthly journal of transactions or other supporting documents. Because of time constraints imposed on the Project, research necessary to support these transactions could not be performed prior to the issuance of the final reconciliation reports to the Tribes.

The OST has recently begun an effort to research rollovers where a tribe's balance decreased from one accounting period to the next. To date, $5.2 in rollover decreases have been verified by the OST staff. OST will continue this research effort. To the extent that the Department is unable to reconcile rollover decreases, the Department agrees with the Advisory Board's proposal to pay Tribes principal plus interest in cases where account balances have decreased.[13] However, the Department proposes that these amounts be netted against known errors inuring to a Tribe's benefit.[14]

---

[12] $1.4 million is attributable to the BIA deposits and $.3 million is attributable to the MMS deposits.

[13] It should be noted that while the Department is proposing that unexplained rollover decreases be paid to Tribes, it has not been determined that an error, in fact, occurred in these instances.

[14] The Department does not agree with the Advisory Board's classification of rollover increases as amounts that need to be "forgiven." In order to determine whether rollover increases actually represent

Attachment C Part 2 to Boswell Declaration

- <u>Interest policy.</u>  An issue that must be resolved is how interest should be paid on amounts owed to Tribes.  There are two considerations in that regard: whether simple or compound interest should be paid, and what rate of interest should be used.

The Advisory Board proposes that interest payments be determined by computing compound interest at a blended Tribal benchmark rate.[15]   While the Tribal benchmark rate is skewed somewhat on the high side by a number of long-term instruments held in one account, it nevertheless has the advantage of being easily determined.  Against this is balanced the fact that the compound rate is greater than what a Tribe could likely recover in litigation; courts generally limit the interest on government trust funds to simple interest on principal only.[16] Accordingly, the Department recommends that simple -- not compound -- interest be paid at the blended Tribal benchmark rate.

- <u>Forgiveness and netting policy.</u>  The Project results indicate that in some cases, BIA errors resulted in overpayments or erroneous payments to a Tribe or to a particular Tribal account.  As a result, some Tribes owe the government money.  When interest is included, the amounts owed by Tribes to the federal government can be significant, and repayment would be a particular burden for Tribes with limited financial resources.  The Department has considered whether it should recommend to Congress that some or all of the amounts owed by Tribes to the government should be forgiven.  Although a policy of forgiving amounts

---

overpayments to Tribes, it would be necessary to perform research on the underlying transactions recorded in BIA's monthly journal of transactions or other supporting documents.  Absent this work being performed, it cannot be concluded that these rollover increases represent overpayments to Tribes.  However, to ensure that the issue of rollover increases is resolved by the settlement, the Department contemplates that settlement legislation will provide that unreconciled rollover increases to a Tribe's accounts be deemed accurate transactions.

[15]  The Tribal benchmark rate is the average annual yield of invested Tribal trust funds.

[16]  It is well settled that the Tribal owner of interest-bearing trust funds that are improperly disbursed by the federal government can recover only the amounts disbursed plus simple interest annually thereon (at the rate prescribed by statute to be paid on these funds).  <u>See, e.g.</u>, <u>United States v. Gila River Pima-Maricopa Indian Community</u>, 586 F.2d 209, 216 (Ct. Cl. 1978); <u>White Mountain Apache Tribe of Arizona v. United States</u>, 20 Cl. Ct. 371, 377 (1990).  And, where a statute or treaty provides for the payment of simple interest, compound interest is not recoverable.  <u>United States v. Mescalero Apache Tribe</u>, 518 F.2d 1309, 1331-33 (Ct. Cl. 1975), <u>cert. denied</u>, 425 U.S. 911 (1976).  In contrast, compound interest is frequently awarded in private sector litigation.

16

0566

owed from Tribes to the United States would deny the government potential revenue, forgiveness of a debt does not require the further expenditure of funds. Congressional authorization would define the parameters of the Department's authority to forgive the repayment of obligations due the government.

The Advisory Board believes that amounts owed by Tribes to the government as a result of errors should be forgiven, for the following reasons:

A.  These are known and admitted errors of the U.S. Government.  Even though the Tribes apparently benefitted by these overpayments, they should not be asked to repay amounts which arose out of the U.S. Government's inability to provide an accurate and timely accounting.

B.  These admitted errors were made over a period of twenty years.  The usual and customary standards for clearing similar exception items in the private sector is one accounting period, usually ninety days or less.[17]

C.  The overpayments were identified for reconciled items only.  Had a full accounting been possible for the $2.4 billion in unreconciled non-investment transactions, or had a full accounting been possible verifying financial transaction to source documents (such as land leases and contracts), or had the Project covered different time periods, the net result for a particular Tribe may have been different.

D.  Tribes should not be asked to reimburse the government unless the government can document that no subsequent correcting entry was made.

There are various forms that a forgiveness policy could take.  For example, amounts that are owed to and from a particular Tribal account, or to and from a particular Tribe (as explained below, some Tribes have several different accounts), could be offset against each other, or "netted."  How the netting policy is structured has significant financial ramifications.  It also could have important legal implications that would require a legislative resolution.

---

[17] While there may be regulatory requirements that exception items be cleared in one accounting period for regulatory or accounting purposes, this does not necessarily mean that a private sector institution would forgive an error in the customer's favor.  Such practices vary by institution, amount at issue, type of customer and other relevant circumstances.

17

0567

The Department maintains two basic categories of funds for Indian Tribes: Judgment funds and Indian Money Proceeds of Labor funds. Within these two major categories, various accounts may exist. For example, within the Judgment category there are accounts for specified purposes, such as education, economic development, burial, etc. Within the Proceeds of Labor category, there are accounts for the proceeds from various tribal resources, such as grazing, mineral leasing, and forestry. If a netting policy authorizes or requires offset or netting of funds among accounts of different types, then funding for the specified purposes of the accounts may be altered. The interests of specific classes of beneficiaries (e.g., all Tribal members, minors) in particular accounts would be altered. The Department believes that Congressional authorization may be required for such alterations.

There are several different options for netting discussed below. The estimated cost to the Treasury for each is based on the government paying Type I claims using the assumptions described above (simple interest based on the Tribal benchmark rate) and does not include adjustments for rollover amounts.

Under a *no-netting approach*, the government would forgive all amounts that were overpaid to Tribes and pay all amounts owed to Tribes, plus interest. This approach would require the greatest expenditure and forgiveness of public funds to pay claims, with actual payment of $13.1 million in principal and $11 million in interest, and forgiveness of $14.0 million in principal and $9.4 million in interest.

*Netting to the Tribal level* would provide for adding or subtracting of all amounts owed to or from a Tribe for all accounts owned by that Tribe (e.g., payment was made to one account of the Tribe when it should have been made to another, or payment was made in the wrong amount to a Tribe's account). In other words, all plus and minus adjustments for all of a Tribe's accounts would be netted together to arrive at a net amount due to or from a Tribe. Interest would also be netted to arrive at a net amount due to or from a Tribe. If this process resulted in a net amount (principal and interest) due to a Tribe, the government would pay that amount. If it resulted in a net amount (principal and interest) due from a Tribe, the government would forgive that amount. Netting to the Tribal level would result in the government paying $3.5 million in principal and $4.0 million in interest, and forgiving $4.4 million in principal and $2.2 million in interest.

18

*Netting to the Tribal account level* would provide for netting all amounts within one account owned by a Tribe, but would not net all accounts of that Tribe against each other. For example, if netting all amounts due to and from a Tribe's settlement fund accounts resulted in a net amount due to the Tribe, the government would pay that amount plus interest to the settlement fund accounts. If this method showed a net amount due from the Tribe, the government would forgive that amount. This approach would require payment of $10.7 million in principal and $9.5 million in interest, and forgiveness of $11.6 million in principal and $7.7 million in interest.

Even with a netting policy, a Tribe still may be found to owe the government money. If no additional forgiveness of the debt is granted, Tribes would be required to reimburse the government. Under the recently enacted Debt Collection Improvement Act, 31 U.S.C. § 3711, et seq. (DCIA), the government may offset payments to satisfy delinquent debts. Applied here, the DCIA could require the government to offset any funds that the government may pay the Tribe in the future against amounts owed by the Tribe to the government.[18] If additional forgiveness is granted, however, a Tribe whose debts are forgiven will have been treated more generously than a Tribe who did not need the additional forgiveness, simply because the amount owed by the Tribe to the government happened to be greater than the amount owed to the Tribe by the government.

The Department envisions that a forgiveness and netting policy should apply. We also anticipate that the settlement legislation should include provisions for netting at the Tribal level. Although the Advisory Board proposed netting at the Tribal account level, that approach fails to recognize that the Tribe already had the benefit of the funds, albeit not necessarily for their original intended purpose. Any legal infirmity due to the inadvertent mixing of funds among accounts would be remedied by the legislation authorizing the settlement. For example, to the extent payments are made to a Tribe, the legislation could authorize Tribes to direct the funds be allocated within their various accounts as the Tribes deem appropriate.

---

[18] Under the DCIA, any federal agency that is owed by a person a past due legally enforceable debt (other than taxes) that is over 180 days delinquent is required to notify the Secretary of the Treasury. The Secretary offsets the debt against certain amounts that may be owed to that person. Historically, the BIA has not considered an Indian Tribe to be a "person," although the Department has not yet reached a conclusion under the DCIA. If, however, a Tribe is deemed to be a "person" under the Act, the offset provisions would apply, subject to provisions of the DCIA prohibiting use of administrative offset for debts over ten years delinquent.

19

After the netting policy is applied, if a Tribe still owes the government money, the Department recommends that the debt be forgiven. This forgiveness policy would nullify application of the DCIA because there would no longer be a valid and legally due debt owed to the United States.

● Waiver/Review. We believe that Tribes which accept payment of Type 1 claims under this settlement process should be required to waive bringing any Type 1 claims as part of any subsequent litigation involving claims encompassed in the scope and time period of the Project. Therefore, we propose that legislation specify that Tribes choosing not to settle their Type 1 claims pursuant to the Type 1 claims procedures will not be entitled to the favorable standards governing netting interest rate or forgiveness that may ultimately be applied under the settlement procedure. In other words, we propose offering favorable rules on netting, interest rate, and forgiveness as an inducement to settle and avoid further litigation.

## 2.    Evaluation of Type 2 Claims

● Evaluation/Guidelines. Type 2 Claims involve one of two circumstances. First, there may be disputes about an account balance based on additional documentation in the Tribe's possession. The Department would evaluate those claims pursuant to the reconciliation standards employed by Arthur Andersen in the Project.[19] Second, there are so-called "passed adjustments" -- transactions

---

[19] In the course of the Project, approximately $6.035 billion in disbursement transactions were categorized as reconciled. Of this amount, about a third -- $1.925 billion in transactions -- were reconciled based on complete voucher packages. The balance -- $4.110 billion in transactions -- were reconciled based on disbursement voucher packages which may not have included, or may not have been required to include, all the supporting documentation described below. A complete disbursement package could include a series of transactional documents, including a signed Form SF-1166 (Authorization to Disburse); an accomplished copy, endorsed by the Treasury Department, of that same Form SF-1166; a Form SF-1034 (Request for Disbursement); and an accompanying Tribal resolution or other Tribal authorization, either authorizing a particular signatory for the SF-1034, or merely requesting payment of the funds. The Advisory Board concluded that "[b]ecause some degree of proof of payment exists and because the Tribes now have access to the images and the documentation for all these transactions, the burden of bringing a claim should fall on the Tribes." The Board estimated that the probability of a loss from incomplete disbursement voucher packages is most likely less than 10 percent. The Board proposed an aggregate settlement of $400 million (about 10 percent of total incomplete disbursement packages), $200 million of which would be used as part of the initial capital of an Indian Development bank (described below), and $200 million of which would be used to satisfy specific claims brought by the Tribes, with individual accounts capped at 5 percent of total incomplete disbursement packages for that Tribe. The Department disagrees with this proposal because these transactions have been reconciled pursuant to the procedures and standards of the Project.

20

Attachment C Part 2 to Boswell Declaration                    0570

which were deemed to be reconciled even though BIA and Arthur Andersen disagreed about the adequacy of the documentation to support the transaction. Claims based on passed adjustments would be handled by submitting them directly to the negotiation/mediation process described in the following paragraphs.

- Process. The Department, through the OST, would be authorized to negotiate with Tribes in good faith in an effort to resolve Type 2 claims. If the Department agrees that an adjustment should be made, resolution would be structured under the provisions for Type 1 claims (including interest rate, forgiveness, netting, etc.). If the new documentation is insufficient under the guidelines to categorize the claim as a Type 1 claim, the claim would be handled under the procedures adopted for Type 3 claims as described below.

In the event the Department and the Tribe are unable to agree on the disposition of a Type 2 claim, the Tribe could request that the matter be submitted to a mediator. The Federal Mediation and Conciliation Service would be requested to appoint a mediator skilled in dispute resolution who would seek to resolve the issue using alternative dispute resolution mechanisms. Resolutions could include categorizing the claim as a Type 1 or Type 3 claim to be settled under the legislated settlement process, proposing a cash settlement or concluding that the claim lacks merit. Mediation would be non-binding.

- Timing. The legislation should provide that Type 2 claims be submitted to the Department within a specified period -- perhaps two years. It is possible that a Type 2 claim would be recategorized as Type 1 after consideration by the Department or a mediator. If this could be done promptly enough, all Type 1 and Type 2 claims could be settled simultaneously. However, because the Tribes have no incentive to submit Type 2 claims in instances where they will owe the government money, and because the Department believes that it is important to resolve the Type 1 claims as promptly as possible, the Department would attempt to handle Type 1 and Type 2 claims together wherever possible, but sees no reason to delay resolution of the Type 1 claims until the Type 2 process is complete.

### 3.    Settlement of Type 3 Claims

During the course of the Project, 32,901 transactions totaling $2.4 billion (in absolute terms) were identified for which supporting documentation was not

21

located.[20] The Department estimates that the maximum potential claims against the government amount to approximately $575 million for the following reasons. Of the total $2.4 billion, $1.123 billion were transactions involving receipt of funds by the government on behalf of a Tribal account from third parties. The government can demonstrate that the unreconciled receipts were posted to the general ledger accounts of a particular Tribe. Accordingly, it is likely that those Tribes benefited from receipt of the funds and the chance of loss is relatively low. (While there is a possibility of a posting error, the Project demonstrated that posting errors in reconciled transactions for the basic reconciliation were extremely low - approximately .01 percent). If errors did occur, such as the funds being credited to the wrong Tribe or Tribal account, there is no way to determine which Tribe or account should have received the money and therefore, no way to direct a corrective deposit.

Similarly, $479.6 million of the unreconciled transactions were transfers of funds within different accounts of the same Tribe. For example, funds may have been erroneously credited to a Tribe's education account which should instead have gone to its burial account. In order to rectify the situation, the funds must be debited from the education account, and then credited to the burial account. In such a situation, there would be no net change in the amount of funds held for the Tribe's benefit. While there is no way to determine whether damage occurred to particular beneficiaries of specific accounts as a result of unreconciled transfers, it is clear that members of the intended Tribe benefited from these transfers even if they were placed in the wrong accounts.

Finally, there were $808.6 million in disbursement transactions for which there was no supporting documentation. Of that amount, $73.6 million are positive disbursements (i.e., receipts) where even had there been an error, it would have benefited the Tribe. An additional $40.5 million was for attorney and expert witness fees and $119.5 million were disbursements of settlement funds to Alaska Regional Corporations. It is reasonable to presume that attorneys, expert witnesses, and the Alaska Regional Corporations would have filed claims had the

---

[20] It is important to note that the lack of supporting documentation for $2.4 billion in transactions does not mean the money was lost, stolen, or otherwise misappropriated. It means that the BIA was unable to locate documents to support the accuracy of transactions reflected in the general ledger. An analogy in the general commercial banking sector would be if a bank were unable to locate copies of cancelled checks.

Attachment C Part 2 to Boswell Declaration

payments not been made.[21]

As a result, deducting the positive disbursements, attorney fees, expert witness fees and Alaska Regional Corporation disbursement transactions, the Department believes that the settlement options should focus on the remaining $575.1 million of undocumented disbursements.

● Settlement of claims. Developing an equitable settlement for potential Type 3 claims is not a simple task. On the one hand, guidelines governing the Project indicated that a transaction would not be categorized as reconciled without certain documentation to support that funds were handled as reflected in the general ledger. On the other hand, there was no indication during the course of the Project that Tribal or IIM funds have been misappropriated, misdirected or lost, although the Project did not specifically examine fraud. And, as noted above, for the 86 percent of transactions which were reconciled, the error rate was extremely low -- .01 percent.

The Department intends to consult with Tribes on their recommendations on how to address Type 3 claims. We have no preconceived approach as we enter these consultations.

The Advisory Board proposes that with respect to undocumented disbursements, a total payment of $300 million would be distributed proportionately to all Tribes with trust accounts, based on the product of the percentage of the Tribe's unreconciled disbursements plus interest and the total of all unreconciled disbursements plus interest. According to the Advisory Board, this award equals 52 percent of total unreconciled disbursement exposure or 15.5 percent of total unreconciled disbursement exposure plus compound interest (it would be 23 percent based on simple interest). In addition, the Advisory Board proposed a general settlement amount of $300 million to be used to help capitalize a proposed Development Bank for American Indians, in settlement of unreconciled receipts, transfers and disbursements (not otherwise addressed in the settlement).

Under the Advisory Board's proposal, half of the amounts paid in settlement would be Tribe-specific, while the balance would go to the proposed Bank, for a

---

[21] The General Accounting Office recently commenced an investigation to determine if the Alaska Regional Corporations suffered losses with respect to these unreconciled disbursement transactions.

23

total amount of $600 million. It is not clear, however, that the $600 million bears any relationship to any actual government liability for the unreconciled disbursement transactions; it should be noted that an unreconciled transaction does not necessarily mean that there was a loss.

The Department requires additional consultation on how to address the Type 3 claims before it makes a specific proposal to Congress. Among the issues on which we will seek the views of the Tribes are the following:

*On what basis does the Department compute the aggregate value of any settlement of Type 3 claims?*

*Do Tribes want the settlement of Type 3 claims to be paid directly to individual Tribes, to go towards some type of total settlement option such as the proposed Bank, or a combination approach such as the one proposed by the Advisory Board?*

*If claims are to be paid directly to Tribes, on what basis should the claims be valued? Should different types of claims be valued differently? How?*

*If claims are to be paid through some type of total settlement option aimed at benefitting Tribes generally, what options should be considered? (The issues raised by total settlement options are discussed on pages ___.)*

*What procedures should apply to settling the Type 3 claims?*

*How should the proposed settlement be affected in the event that some Tribes choose not to participate in the settlement?*

*How should the total amount of the settlement be determined?*

*What type of waiver of claims should be required of Tribes that opt to participate in the Type 3 settlement process?*

*What percentages should be used to calculate settlement amounts?*

*To the extent that compensation is paid for transactions for which no*

24

*documentation exists, how should it be distributed among the Tribes?*

## V.    <u>LITIGATION</u>

Tribes that do not settle their claims under the settlement procedure outlined above may wish to litigate those claims in court. In the past, similar litigation has often proved extremely costly and time-consuming for all the litigants. Given this history, we specifically want to avoid any litigation process that would resemble the Indian Claims Commission proceedings of years past. To avoid this result, we believe that legislation establishing the settlement procedures also must establish certain parameters for judicial litigation of claims of non-settlers. Such parameters are necessary to ensure that litigation proceeds in an orderly and efficient manner, to ensure that the beneficiaries of the claims, as opposed to their attorneys and accountants, are the persons who benefit from any amounts recovered in litigation, and to encourage settlement of as many claims as possible. The Department is considering several parameters including the following:

- <u>Statute of Limitations</u>: All claims for the period preceding September 30, 1995,[22] must be brought within two years of the date of enactment of the legislation or 90 days after the conclusion of the Type 2 claims process, whichever is later.

- <u>Burden of Proof</u>: The Tribal account holder will bear the burden of proof on damages, under applicable fiduciary standards. The burden of going forward will first be on the account holder, to present a prima facie case on liability. If that burden is satisfied, the burden of going forward then would shift to the government, to show that the Tribe's accounts are correct by some predetermined quantum of evidence appropriate in the circumstances. The account holder would then have the opportunity to produce evidence to respond to that showing.

---

[22] Although the Reconciliation Project covered the 1972-1992 time period, the Act provides that the Secretary's report shall identify for each Tribal trust fund account, a balance reconciled as of September 30, 1995. In response, OTFM has been internally reconciling Tribal trust fund accounts and providing statements to Tribal trust fund account holders since 1992. In order to bring some closure to the litigation process, we propose that all claims for the period preceding September 30, 1995, must be brought by Tribes who choose to litigate.

25

- <u>Waiver</u>:  At the conclusion of any such litigation, the court would adjudicate and declare as final the balance in the accounts which are the subject of the litigation as of September 30, 1995.  Any claims of mismanagement of the underlying trust assets also would have to be brought simultaneously or would be barred.

The purpose of these parameters is to achieve a final balance in Tribal accounts as of September 30, 1995, much like the Indian Claims Commission legislation, which also established a baseline date from which to look forward.

## VI.    TOTAL SETTLEMENT ALTERNATIVES

The settlement process outlined above concerns resolution of claims arising within the scope and period of the Project.  It does not address claims that Tribes may have arising from the period preceding or subsequent to the reconciliation period, or for claims related to deficiencies in other aspects of the Department's trust asset management outside the scope of the Project (including management of the underlying trust assets).

In order to arrive at settlement that would truly put to rest all trust management and accounting issues predating September 30, 1995, Congress may also want to address all of these other potential claims through what we refer to as a "total settlement" approach.  A settlement of this type conceivably could encompass IIM claims as well.  In many respects, developing an equitable approach to a total settlement is even more challenging than crafting a resolution of Type 3 claims.  There has been no methodical analysis of the nature and scope of deficiencies, if any, that would be addressed in a total settlement approach, although Tribes have long criticized various aspects of the Department's management of their assets.

Moreover, assuming that some type of programmatic settlement is adopted, a number of issues arise, including:  criteria for participation (should participation be limited to Tribes whose claims meet specified criteria, or be available to any Tribe with Tribal accounts); what form participation would take (<u>e.g.</u>, if an education fund were established, would each Tribe be eligible for a one-time payment in a certain amount for educational purposes, or would Tribal members be entitled to apply for scholarships); how participation in this component would

26

fit in with the payment of individual Tribe's specific claims (e.g., would this replace or be in addition to payments to settle specific claims, would there be offsets, cumulative limits to the settlement, etc.); what is the relationship between access to the benefits of the programmatic settlement and the amount of potential claims a Tribe may have; and the source of funding.

Yet, the prospect of achieving some degree of finality on trust asset issues is attractive for both the Department and Tribes alike. It will allow us to focus on prospective reforms that will result in more accurate and productive management of Tribal resources. Moreover, a total settlement option could encourage further the settlement of claims based on the Project, and settle claims relating to trust issues that fall outside the scope or time period of the Project. This approach would only be successful, however, if most Tribes agreed to participate in the program and specifically agreed to waive all Tribal trust claims through September 30, 1995.

As with Type 3 claims, the Department has not adopted a position on whether a total settlement approach is either in the public interest or is workable. Moreover, it endorses no particular approach to a total settlement option should we decide to recommend a total settlement component. Both matters will be the subject of further consultations with the Tribes. However, for purposes of discussion and illustration only, we outline several possible approaches for Tribal consideration. These generally are intended to advance economic development in Indian country and are structured to meet the policy objectives of the Tribes themselves, rather than those of the government. Moreover, these are not the only possible total settlement options. Over the next several months, as we engage in Tribal consultations, we will be considering other initiatives that may serve as an appropriate mechanism.

### A.    Advisory Board Proposal - Development Bank

One option proposed by the Advisory Board consists of the establishment of a development bank for American Indians with certain capital and assurances provided by the United States Government. The Advisory Board proposal envisions the United States forming and capitalizing a federal Development Bank for American Indians to serve as a nationwide financial institution providing a dependable source of lending to American Indians and Tribes and a dependable source of funds for investment in American Indian enterprises. The Advisory

27

Board would allow all IIM and Tribal account holders to participate in the Bank, in settlement of all potential claims arising out of the Project not covered by the other components of the Advisory Board's settlement proposal, as well as any past potential liability for trust management practices in general. Under the Advisory Board's approach, the Bank would be partially capitalized by the proceeds of two general settlement components for all Tribes with trust accounts, to address all unreconciled transactions arising from the Project ($300 million) and some potential liability for all reconciled disbursements with incomplete disbursement voucher packages ($200 million). Shares would be distributed to all federally recognized Tribes on some equitable basis set forth in the legislation. In total, the United States would provide the following capital and guarantees for the Bank:

| | | |
|---|---|---|
| Equity Capital | - | $500 million |
| Borrowing Capacity guaranteed by U.S. | - | 10 times equity capital |
| Initial Borrowing from U.S. | - | $3 billion for 30 years at 30-year Treasury Rate |

The Bank would provide access to long-term loans and investments for economic development and would provide access to low interest rates on loans, made possible by the Bank's tax-free status and its access to funding in the Nation's capital markets at rates commensurate with those paid by the U.S. Government. The Bank would be a for-profit financial institution and would not receive appropriated funds for operating expenses. It would receive appropriated funds for lifeline financial services and other specific programs as approved by Congress. The Bank would be authorized to invest up to 25 percent (initially $125 million) of its permanent capital in eligible Indian businesses and projects.

The Bank would also be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotted lands. According to the Advisory Board, such purchases and financing would be made on "prudential terms" to eligible individuals and Tribes. Fractionated heirship activities would be governed by rules in the legislation to resolve the fractionated heirship problem, and would be administered to achieve the consolidation of existing fractional interests and to prevent or substantially reduce future fractionation. The fractionated heirship problem is discussed more fully below on pages 30-31.

28

As with any total settlement option, the Advisory Board Development Bank proposal would have the advantage of finally resolving all claims arising out of the United States' management of Tribal trust funds (other than those which Tribes choose to litigate). The Advisory Board recommends extending the Bank settlement option to resolve IIM claims as well. It is unclear whether smaller Tribes or individuals would be likely to support or take advantage of the Development Bank settlement option; their interests might be better served by providing more direct access to funding for other purposes. It also is unclear whether the Advisory Board proposal would provide access to the Development Bank to non-Indian IIM account holders.

There are many unanswered questions about the Advisory Board's proposal for a Development Bank, including the relationship between the Bank and non-Indian IIM account holders, how membership in the Bank should be determined, mechanisms for accountability and control of the Bank and the status of Tribes which choose to litigate rather than settle their claims. Moreover, as a general policy, the Treasury Department strongly opposes Federal entities having authority to borrow in the credit markets. In short, the Department has many questions about this proposal and, at this point in time, specifically does not endorse it. However, the Advisory Board's proposal warrants consideration and has been included in this report to generate additional thought and discussion.

## B.  General Program for Trust Resource Management or Other Activities

A second option for a total settlement of claims would be some type of general settlement grant or other program providing access to funds for Tribal economic development purposes. The terms and conditions for such a program would be defined in authorizing legislation and would conform to longstanding federal financial policies. The intention would be to provide a source of funding for types of initiatives for which no other funding is readily available.

For example, in settlement of all potential outstanding Tribal trust management claims, legislation could establish a permanent or temporary grant or other program to provide Tribes with access to financial support for Tribally-owned businesses or other Tribal economic development projects. Administration of the program could be performed by the Secretary of the Interior, the Attorney

29

General, or other appropriate official. The program could be financed and made available to all federally recognized Tribes on an ongoing basis, with criteria governing eligibility, appropriate projects, the amount available to each Tribe in a given year or time period, total funding available, repayment obligations, etc. This approach would provide Tribes with direct access to funding to undertake and support American Indian businesses and projects, as opposed to the ability to borrow money to pursue these concerns provided in the Advisory Board's Development Bank proposal. Alternatively, a fund could be established and claims would be made against the fund, with acceptance of payments considered to be in full satisfaction of any claims on behalf of a Tribe, similar to the claims procedure used in other restitution funds administered by the United States. A Tribe's acceptance of such a total settlement proposal would extinguish all of its outstanding Tribal trust fund claims.

### C.  Fractionated Heirship Land Acquisition Program

A third option for a total settlement of claims would be an initiative to address the fractionated heirship problem, which is a major cause of the difficulties in the administration of the BIA's trust fund management systems and BIA's inability to obtain more productive returns for the use of trust lands. As noted above, the Advisory Board's Development Bank proposal would direct some funds toward resolving this issue. It could, however, be addressed in any number of ways, with or without the existence of the Bank.

Fractionated heirship is an indirect result of the 1887 General Allotment Act, which directed the division of Tribal lands and allotment of them to individual Indians. Allotted or individually-owned trust lands comprise approximately 11 million acres. As originally envisioned, allotments were to be held in trust by the United States for their Indian owners for no longer than 25 years, after which the land would be conveyed in fee simple to the Indian owners. Many allottees died without wills during the 25-year trust period, and it also became evident that many allottees' land continued to need federal trust protection. Consequently, Congress enacted limited probate laws and authorized the President to extend the trust period for those individuals who were not competent to manage their lands. The presumption was, however, that at some point in the then-foreseeable future the lands would be conveyed to their Indian owners free of federal restrictions. Nevertheless, Congress continued to extend the period of trust protection but did not amend the probate laws. Under the Indian probate laws, as individuals died

without wills, their property descended to their heirs as undivided fractional interests in the allotment.    As the years passed, fractionation has expanded geometrically to the point where there are hundreds of thousands of tiny fractional interests in Indian Trust property.  Without action, this problem will become even more severe.

Congress attempted to address the fractionation problem with passage of the Indian Land Consolidation Act (ILCA) in 1984.  The ILCA authorized the buying, selling and trading of fractional interests.  Most importantly, it provided for the escheat to Tribes of interests of less than 2 percent.  Although over 55,000 of the 2 percent-or-less fractional interests have escheated since 1984, the fractionation problem continues to worsen.    Maintaining heirship and land records and administering the land is inordinately expensive, and the administration of the records pertaining to the moneys earned by each individual allottee is equally expensive and difficult.  This is a major cause of the problem with maintaining individual Indian trust accounts.[23]  Equally important, utilization and conveyance of the fractionated property by the numerous owners is difficult because of the need to secure the numerous consents required.

The Department believes that legislation which would consolidate the large number of existing fractionated interests and prevent further fractionation would benefit the Tribes by promoting self-determination, and by removing a significant obstacle to the efficient administration of Indian trust funds.[24]  The legislation would have to specify the criteria for participation, whether the Department would commit to buying a certain number of interests for each Tribe, whether there would be cumulative limits to the settlement funding, and other issues.  The fractionated heirship land acquisition proposal could comprise or be a portion of a broader total settlement proposal to resolve all Tribal trust fund claims.

---

[23]  Over 170,000 IIM accounts -- about 55 percent of all accounts -- have a balance of less than $10.

[24]  We recognize that fractionation is one major cause of the current state of trust funds management. In order to prevent further fractionation, it will be necessary to change inheritance laws relating to Indian allotments.  Currently, however, the constitutionality of the Indian Land Consolidation Act (25 U.S.C. § 2206) is before the United States Supreme Court in the case of Babbitt v. Youpee, Case No. 95-1595.  In Youpee v. Babbitt, 67 F.3d 194 (9th Cir. 1995) the appellate court held that the ILCA violates the right of certain Indians to convey their allotment interests freely.  We anticipate that the Supreme Court's resolution of this case, which was argued earlier this month, will provide needed insight into the best means for balancing the need to control fractionation with the inheritance rights of individual Indians.

31

0581

### D.    Consultation

Because of the complexity of these proposals, the need to generate near universal support among Tribes in order for the total settlement approach to be successful, and the Administration's policy on government-to-government relations with Tribes, the Department believes additional consultation on all these ideas is required.  The Department intends to circulate this analysis to all Tribes and interested parties who may have Tribal trust fund claims to solicit their ideas for a total settlement initiative and explore their willingness to waive their own claims if one were to be implemented.  The Department will submit a supplemental report to the Congress in April 1997, with its findings and additional recommendations.

## VII.  OTHER TRUST FUNDS ISSUES

### A.  Restoration of Overdraft Interest Clearing Accounts and Settlement of Miscellaneous Losses

There are two additional issues that might be addressed by legislation. These issues relate to the restoration of overdraft interest clearing accounts (which apply only to IIM accounts) and settlement of miscellaneous losses (which apply to both Tribal and IIM accounts).

In the course of reviewing IIM accounts, OST staff determined that there is $42.2 million in unidentified Overdraft Interest Clearing accounts in the detailed IIM subsidiary ledger.  Overdraft interest clearing accounts are control accounts that are used when interest is posted to the underlying individual accounts.  When interest is credited to the underlying accounts, the control account is debited. When interest is funded the control accounts are credited.  The amounts debited and credited, in theory, should be equal.  The current debit balances in these accounts are likely the result of either the non-posting of interest in the IIM subsidiary ledger that was funded, or interest credited to individual account holders in excess of what was actually earned/funded.  Research on these accounts is continuing.

The Advisory Board proposes that $42.2 million be appropriated to restore these accounts, as the practical effect of these overdrafts is that current IIM account holders are deprived of approximately $2 million in interest income

32

annually. This assertion is not entirely accurate, as the total assets actually invested in the IIM account pool exceed the balance in the IIM subsidiary ledger. The Department agrees that these discrepancies need to investigated, and if necessary, rectified. However, it is not clear at this time how much funding, if any, is needed.

The review also identified $28.3 million in other miscellaneous losses, broken down as follows:

(millions of dollars)

| | |
|---|---|
| Loss and associated interest | $10.0 |
| To bring subsidiary (IRMS) and Control Account (OMNI) into balance | 10.8 |
| Budget suspense accounts | 1.0 |
| Clean-up remaining General Ledger Accounts | 6.5 |
| Total | $28.3 |

The Advisory Board proposes that $28.3 million be restored to the IIM accounts.

Although the Department agrees that these discrepancies need to be rectified, it is not clear how much funding is necessary to do so. In some cases, simple accounting adjustments might be sufficient. Over the next several months, the OST will prepare a detailed analysis of all accounts in the trust fund general ledger and subsidiary ledgers which (1) explains how the accounts correspond to the actual underlying assets and liabilities; (2) quantifies the resultant deficiency/equity of the trust fund as a whole; and (3) explains the efforts that have been undertaken to rectify these variances. The Department also recommends that legislation provide general authority to clear trust fund subsidiary and general ledger account discrepancies. This authority could be exercised after reports on the nature of the discrepancies and descriptions of efforts taken to resolve those discrepancies are submitted to and approved by the Office of Management and Budget.

**B.    Funding of the Settlement Legislation**

33

0583

The Advisory Board proposes that claims be paid from the Judgment Fund[25] although it does not identify a specific reason for this position.

Any of these proposals would require the government to pay significant amounts of money. Some Tribes have pointed out that to the extent that settlement would be funded from Departmental funds and scored against the BIA budget, the settlement would effectively be funded from programs for which the Tribal beneficiaries are otherwise the intended beneficiaries. Tribes with small or no trust fund claims also might conclude that they are helping to fund payment of claims to other Tribes through the reduction in funding of the programs that are intended to benefit them. Tribes with trust funds could also claim that they lost twice: initially through the incorrect management of their trust funds, and a second time by a reduction in programs and services to the Tribes and their members that a reduction in BIA funding would necessarily entail. Moreover, some Tribes have pointed out that similar major liability claims against the government, such as those arising from the failure of federally insured savings and loan institutions, were not scored against a particular agency.

If these claims were to be settled through litigation rather than legislation, judgments would likely be paid through the Judgment Fund. In enacting settlement legislation, we urge that the Congress take steps to ensure that any payments to resolve these areas of difference not be made in a manner that would jeopardize current levels of service to Tribes and individuals who, collectively, have experienced the lowest level of economic recovery of any group in the Nation and for whom the government has pledged a special trust relationship emanating from treaties and compacts entered into on a government-to-government basis. The Department's final recommendations will address a source of funding for the settlement.

---

[25] The Judgment Fund is administered by the Secretary of the Treasury, and is funded by a permanent, indefinite appropriation.

34